Filed 12/19/14  P. v. Calderon CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>LUIS CALDERON,<br><br>        Defendant and Appellant. | F066877<br><br>(Tulare Super. Ct. No. VCF240349)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  James W. Hollman, Judge.

A.M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Luis Calderon was charged with several sex offenses committed against girls under the age of 14.  A jury convicted him on some, but not all, of the counts.  He was sentenced to 46 years in prison.

On appeal, defendant raises several claims of prosecutorial misconduct during cross-examination and argument, none of which warrant reversal.  He also challenges the admission of evidence regarding several uncharged incidents involving other young girls pursuant to Evidence Code section 1108.  We conclude the court did not err in admitting the evidence.  Defendant also claims that his concurrent sentence for one of the counts should be stayed pursuant to Penal Code section 654.[1]  Respondent offers a concession on this issue, which we accept.  We will amend the judgment accordingly.  Finally, defendant challenges the imposition of a sexual assault medical examination fee. (§ 1203.1h, subd. (b).)  We conclude defendant forfeited this claim.

Consequently, we modify the judgment to reflect a stay on the imposition of the concurrent term on count 9.  We affirm the judgment so modified.

**STATEMENT OF THE CASE**

In a third amended information, defendant was charged with the following:  Three counts of committing a lewd act upon a child under the age of 14 (counts 1, 10, and 11; § 288, subd. (a)); six counts of committing a forcible lewd act upon a child under the age of 14 (counts 2 through 7; § 288, subd. (b)(1)), two counts of contacting and communicating with a minor with intent to commit a sexual offense (counts 8 and 9; § 288.3, subd. (a)), and one count of first degree burglary (count 12; § 459.)  As to counts 1 through 7, it was alleged that defendant personally used a knife (§§ 12022, subd. (b)(1) & 667.61, subd. (b)), that there were multiple victims (§ 667.61, subd. (b)), and that defendant had served two prior prison terms (§ 667.5, subd. (b).)[2]  As to counts 2 through 6 and count 11, the information alleged defendant had substantial sexual contact with a child under the age of 14.  (§ 1203.066, subd. (a)(8).)  As to counts 10 and 11, the information alleged that defendant committed a residential burglary with the intent to

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant's two prior prison terms were also alleged as to counts 8 and 9.

2.

commit a lewd or lascivious act on a child under the age of 14 (§ 667.61, subds. (a) & (d), and that there were multiple victims (§ 667.61, subd. (b).) As to counts 10 through 12, the information alleged defendant was on bail. (§ 12022.1.)

After a trial, the jury convicted defendant on counts 1, 2, 3, 5, 7, and 9, and the lesser included offense of lewd act upon a child under the age of 14 (§ 288, subd. (a)) on counts 4 and 6. The jury acquitted defendant on count 8 and announced they were unable to reach a verdict on counts 10 through 12. The jury found true the special allegation that defendant had substantial sexual conduct with a child under the age of 14 (§ 1203.066, subd. (a)(8)) as to counts 2 through 6. The jury found all other enhancements not true.

Defendant admitted the prior prison terms. (§ 667.5, subd. (b).)

The court dismissed counts 10, 11, and 12 without prejudice. Defendant was sentenced to an aggregate term of 46 years. The sentence was comprised of the following: eight years on count 1; two consecutive two-year terms on counts 4 and 6; four consecutive eight-year terms on counts 2, 3, 5, and 7; and two consecutive one-year terms on the prior prison term enhancements. The court also imposed a concurrent term of four years on count 9. The court imposed several fees, including $800 for a sexual assault medical examination. (§ 1203.1h, subd. (b).)

## TRIAL EVIDENCE

### C.L. (Counts 1-9)

C.L. lived in California with her aunt. One summer, when C.L. was "about 13" she went to visit her cousin Jay[3] in Porterville.

C.L.'s aunt's friend, Leonda [B.], also lived in Porterville. Defendant approached the gate where Leonda was living and asked where her neighbor, "Sissy," was. A nearby empty trailer was available to rent, and Sissy asked if she and defendant could look at it. Leonda walked them back to the trailer, then left.

_____

[3] Jay is referred to as C.L.'s uncle or cousin at various points in the testimony.

At some point, Sissy approached Leonda and said defendant was still in the trailer and was "acting weird." Leonda told defendant he had to leave. Defendant "kind of argued" for a couple minutes but eventually left. Leonda locked the doors to the trailer. Sometime later, Leonda was told that defendant was back in the trailer. She "kicked him out again."

An unspecified amount of time passed, and C.L. was now playing in a yard near the trailer, looking for BB's. Leonda asked C.L. not to play there because she "got a weird feeling" about defendant.

C.L. noticed a man she had never seen before was "giving away beer." The man waved at C.L., but she kept looking for BB's. The man went behind the trailer and was drinking beer. C.L. went over to the man, and he asked her what she was doing. C.L. said she was collecting BB's.

C.L. had noticed two of her cousins arguing about beer, so she asked the man for a beer to bring to Jay. The man told her the beer was in the trailer. Once they were inside the trailer, the man put beer into C.L.'s jar. The man told C.L. to go into the next room because he "had something else in there."

When C.L. went into the room, the man told her to pull down her pants. She told the man, "[N]o." He reached into his back pocket. C.L. saw "a handle of … a knife or something like that" so she "freaked out." C.L. only saw the handle. C.L. "did what he said" so she "wouldn't get hurt." The man made her get on the floor and lie down on her stomach. The man pulled his pants down and "was putting his private into [C.L.'s] butt." He also touched C.L.'s breasts.

The man thought he heard someone outside and made C.L. get into a little cabinet. C.L. was scared of a spider in the cabinet. The man killed the spider and told her to get inside.

When Jay returned from a trip to the store at around 6:00 or 7:00 in the evening, he said C.L. was missing. Everyone in the vicinity began to look for her.

4.

Leonda came into the trailer and spoke with the man who had been molesting C.L. Leonda looked around but did not see anything. She did not open up any closet doors or look under the kitchen sink. C.L. did not say anything because she was scared. Leonda then left.

The man had C.L. get out of the cabinet and lie on her back. The man inserted his penis into C.L.'s vagina. He rubbed her breasts, and touched the outside of her vagina with his finger.

The man wanted C.L. to kiss his "private," but she refused. The man said, "Fine, then just hold it." C.L. again refused but he "reached for the knife" so she agreed. His "private" felt "slimy."

C.L. eventually heard Leonda coming back to the trailer with other people. The man took C.L. to a closet and told her to get inside. He handed C.L. some lottery cards and closed the closet door. After C.L. came out of the closet, the man took the lottery cards back. He told her to take some money. She grabbed the money but then handed it back to him. He shoved the money, totaling $7, in her pants.

Sometime after Leonda had left the trailer the first time, someone approached her and told her she needed to go look in the trailer. When she arrived at the trailer, defendant was standing there. C.L. called out for Leonda, who found her stuffed in a "cupboard door." When Leonda took her out of the trailer, C.L. was crying and "in hysterics." Leonda asked, "Did he touch you?" C.L. responded, "Yeah."

Leonda told Johnny, a neighbor, to "go after him to get him out of there." Johnny saw the man jump over a fence and start running. Johnny chased the man, but ultimately lost him. Johnny identified defendant in a photographic lineup as the man he saw in the trailer. Johnny said he was 90 percent sure of his identification.

### C.L.'s Interview with Detective Sutherland

Porterville Police Detective Aaron Sutherland interviewed C.L. on the night of the incident. C.L. told Sutherland that the man had grabbed her and pulled her into the

5.

trailer.[4]  The man told her that if she screamed, he would hurt her.  C.L. saw a knife in the man's pocket.

C.L. conveyed to Detective Sutherland that the man pulled down her pants, pushed her to the ground, put "his private in – on mine" and asked if "it" was inside.  The man heard Leonda coming, so he put C.L. in a closet.  Afterwards, the man touched C.L.'s "butt cheeks" and put two fingers inside her vagina.  The man wanted C.L. to "suck on … his private," but she refused.  He threatened her, so she touched his penis.  At some point, the man inserted his penis into C.L.'s "butt."

At one point, after he had pinned C.L. down, the man "pulled it out" and some "slime" came out of his penis.  He wiped it onto his shirt.

The man tried to hand her money, but she did not want it.  C.L. told him she wanted to leave.  Eventually he made her take the money.  She later explained that the money was "on a credit card" and was not cash.  He also gave her $30 worth of lottery tickets.

A DNA sample swabbed from C.L.'s neck included defendant as a possible contributor to the sample.

*Defendant's Testimony*

Defendant testified to a different version of events.  On July 31, 2010, defendant came to Leonda's home to purchase and use drugs.  Prior to that day, defendant had used drugs with Leonda, Sissy, Johnny and others.  On the way to Leonda's, he bought a 12-pack of beer and some cigarettes.  Leonda came out and asked defendant how he was doing.  Defendant said he was "out drinking a few beers and trying to score some drugs."  Leonda said, "Well, come in."

---

[4] C.L. later admitted that the man had not dragged her into the trailer.  She had lied to police because she was afraid she would get in trouble.  She knew she should not have gone to talk to the man.  C.L. told a friend the truth that she had gone into the trailer hoping to get a beer.  C.L.'s aunt eventually learned the truth and informed the police.

Eventually, defendant, Leonda and Johnny were in Leonda's "side garage." Leonda , Johnny and defendant smoked methamphetamine and drank beer. Defendant asked Johnny if he could "score" him some drugs. Johnny agreed and had drugs delivered to the property. Defendant bought $40 worth of methamphetamine. Afterwards, they all "continued to get high."

Leonda eventually said it would be best if they all returned to her trailer. Defendant, Leonda and Johnny went back to the trailer. They smoked the methamphetamine defendant had purchased from Johnny. Throughout this time, people were coming in and out of the trailer. At one point, when defendant was by himself in the trailer, C.L. "showed up" at the back stairs. Defendant asked her what she was doing. C.L. said her uncle, Jay, had sent her to ask defendant for beer. Defendant gave her two beers and she left. That was the only encounter defendant had with C.L. that day.

Eventually, Leonda said she needed to close up the trailer and asked defendant to leave. Defendant complied and went to his cousin's house.

Defendant denied doing anything sexual with C.L.

*Detective Sutherland's Rebuttal Testimony*

Detective Sutherland testified that when he spoke with Leonda on the night of July 31, 2010, she did not appear to be under the influence of any narcotic. That night, Sutherland looked around the trailer and found no evidence of drug paraphernalia.

Several days after the incident, Detective Sutherland spoke with defendant. Defendant did not say he had gone to Leonda's house to use and purchase drugs. Defendant said he "heard people looking or calling for somebody but … didn't know who they were talking about." Defendant told Sutherland he helped to look for the missing girl. Defendant also told Sutherland that he never saw C.L. that day.

*C.L.'s Prior Allegations of Sexual Abuse*

Police Officer Michael Benas is a patrol officer for Porterville. On May 25, 2008, he had contact with C.L., who alleged that she had been sodomized at school the prior

7.

day. C.L. told Officer Benas that the culprit was an unidentified boy who was "about" 12 years old. Eventually, Detective Olmos took over the investigation. He could not find any evidence to support C.L.'s allegation.

C.L. eventually changed her statement. She said that she was sodomized three different times by her uncle, Juan S. Nothing came of the investigation.

A woman named K.H. testified that she lived in the same house as C.L. in 2005.[5] One night, K.H. heard R.L., T.L. [6] and Juan yelling at C.L. saying, "You're gonna be in trouble, you're gonna be in trouble, you're gonna be grounded, we're gonna take all your toys away, we're gonna spank you, you're gonna be in so much trouble." C.L. said, "But it was Uncle Juan. It was Uncle Juan who touched me." R.L., T.L. and Juan said, "You better say it was a boy at school or else .…"

On cross-examination, C.L. testified that she did not remember alleging that a boy had sodomized her at school. She did recall alleging that her Uncle Juan had molested her.

### T.G. (Counts 10-12)

T.G. testified that she woke up one night "last May"[7] with a man next to her in bed. She noticed a pocket knife above her head on the dresser. The man kissed her and touched her vagina.

T.G. did not identify defendant as the man who had touched her. Defendant denied ever getting into T.G.'s bed or touching her.

---

[5] K.H.'s husband is C.L.'s cousin. K.H.'s testimony suggests she was not married to C.L.'s cousin in 2005.

[6] T.L. is C.L.'s aunt. R.L. was another relative of C.L., but K.H. was not sure the exact nature of the relation.

[7] T.G. was 11 years old when she testified.

8.

**Evidence Code section 1108 Evidence**

The prosecution also introduced evidence of several uncharged incidents pursuant to Evidence Code section 1108.

*A.G. Incident*

In 2005, when A.G. was a minor, she spoke to police about an incident.[8] A.G. and a friend had gone for a walk. Defendant, a stranger to the two girls, drove by in a pickup. He told the two girls he could take them to a party. The girls got into the pickup and defendant took them to a house.

At some point, A.G. came to be alone with defendant in his truck at a school. Defendant began trying to push her down, and A.G. tried to push him off. Defendant said, "Let me get it in and let me get wet." A.G. understood him to be referring to his penis. The next thing she remembered was when she woke up in an alley the next morning with her pants unzipped and her "crotch" hurting.

Defendant's Testimony

Defendant testified that he was driving down the street when A.G. and her friend waved him down and asked for a ride. The girls asked for a ride to the store, so defendant took them there. The girls then asked if defendant could take them to another friend's house. Defendant did so, and they picked up a third girl. Defendant then stopped at his own friend's house to get gas money. The girls asked defendant if he could leave his keys in the truck. He agreed to leave the keys, but asked for "their phone"[9] as "collateral" in case they took off with his truck.

---

[8] A.G. was 21 when she testified and "believe[d]" she was 14 when the incident occurred.

[9] Defendant's testimony makes in unclear whether he asked for each girls' phone.

9.

When defendant came back, his truck and the three girls were gone.  Defendant waited "hours and hours" for the girls to return, but they never did.  He eventually recovered his truck when one of the girls' mothers brought it to a Walmart parking lot.

Defendant denied ever trying to have sex with A.G.  However, he admitted that he pled guilty to misdemeanor battery against A.G.

<u>Sergeant Mark Knox's Testimony</u>

Sergeant Mark Knox with the Porterville Police Department investigated the A.G. incident.  Sergeant Knox spoke with defendant and did not recall him mentioning anything about his truck being taken.

*J.G. Incidents*

In 2006, when J.G. was in 7th or 8th grade, she told police that had been "followed" on several occasions.  She remembered walking home from school and noticing defendant following her.[10]  The man would follow her in a car as soon as she walked off campus.  He did so "fairly often."  One time, the man approached her and asked if she wanted a ride.  J.G. said no and "took off" towards her house.[11]

*L.C. Incident*

In 2006, when L.C. was "[l]ike eleven or twelve," she heard a knock on her door.  L.C.'s father had just left, and she assumed he was returning to retrieve something he had forgotten.  When she opened the door, defendant was standing there.  She had never seen him before.

Defendant claimed his name was Jose.  He "said something about video games and movies or something for [L.C.'s] brother that he was selling."  He asked L.C.

---

[10] J.G. testified she was "90 percent sure" defendant was the man who followed her.

[11] J.G.'s testimony on this point was equivocal.  She said, "I believe I may have said – said no, and I just took off down to home."

whether she wanted to come to his house to pick them up. L.C. did not agree to go to his house.

Defendant said L.C.'s boyfriend had "hooked up with his wife." Defendant wanted to "hook up with" L.C. to get back at her boyfriend.

Defendant began touching her hair and trying to hug her, so L.C. "freaked out" and tried to push him out of the door. Defendant tried to stop the door with his foot, but the door eventually shut, and L.C. was able to call her father.

<u>Defendant's Testimony</u>

Defendant admitted that he did go to L.C.'s house. However, his intent was to trade marijuana for jewelry. When he arrived, he told L.C. that he wanted to hire her father to do yard work. He also spoke directly with L.C.'s father.

Defendant denied touching L.C.'s hair, talking about L.C.'s boyfriend or having any sexual interest in her.

## DISCUSSION

I. **THE PROSECUTOR DID NOT COMMIT PREJUDICIAL MISCONDUCT BY ASKING DEFENDANT WHETHER OTHER WITNESSES WERE LYING**

While the prosecutor cross-examined defendant, the following exchange occurred:

"Q. So you think that [J.G.] just came in here, she's making all that up?

"[Defense counsel:]: Objection, your Honor. That's argumentative.

"THE COURT: It's argumentative. You can rephrase it.

"Q. So [J.G.] is lying.

"[Defense counsel:] Same objection, your Honor. It's argumentative.

"THE COURT: Sustained."

Later, also during the prosecutor's cross-examination of defendant, the following exchange occurred:

"Q. Okay. So you're saying that everything [A.G.] came into court and said was a lie; correct?

11.

"A. Yes.

"Q. And you're saying that you never did anything with [C.L.]; correct?

"A. That's correct.

"Q. So everything that [C.L.] came into court and testified to is untrue.

"A. That's – that's correct.

"Q. And are you also saying that Johnny [H.] and Leonda [B.] and Teresa [G.] all testified untruthfully?

"A. Yes.

"Q. And you said that you never did anything to [T.G.]; correct?

"A. Correct.

"Q. And so you're saying [T.G.] lied?

"A. Yes.

"Q. And you are also saying that Deanna and Rose and Loretta and Jessie lied?

"A. Yes.

"Q. Even though your stories are much different than what you told the detectives at the time.

"A. I don't remember exactly what I told the detective—

"Q. You don't remember. Okay. Thank you.

"A. – in the interview."

Defendant contends that the prosecutor's questions asking whether certain other witnesses were lying "transgressed … permissible boundaries." We find no prejudicial error.

First, we consider the two questions to which defense counsel objected. As to those questions, the court agreed with defense counsel and sustained the objections. In other words, defendant got the ruling he wanted. And the court later instructed the jury:

12.

"If I sustained an objection, you must ignore the question. If the witnesses was not permitted to answer, do not guess what the answer might have been or why I ruled as I did." Consequently, we "see no prejudice, since the defense objection was sustained … [defendant] did not answer the question, and the jury was instructed to disregard the question. [Citation.]" (*People v. Pinholster* (1992) 1 Cal.4th 865, 943, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Next, we consider the second group of "were-they-lying" questions asked by the prosecutor. Defense counsel registered no objections to this set of questions. Therefore, defendant's claim as to those questions is forfeited. (See *People v. Dykes* (2009) 46 Cal.4th 731, 763.)

Defendant contends his counsel was ineffective for failing to object to the second round of "were-they-lying" questions. This argument fails because " 'deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

Even if defendant had not forfeited this claim, we would reject it. Defendant cites a federal appellate court decision for the proposition that "were-they-lying questions invade the province of the jury, as credibility determinations are to be made by the jury, not the testifying witness. [Citations.]" (*United States v. Schmitz* (11th Cir. 2011) 634 F.3d 1247, 1269.) But our Supreme Court has rejected this rationale. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 380.)

> "It is a truism that it is for the jury to determine credibility. Questions that legitimately assist the jurors in discharging that obligation are proper. The 'legal cliché used by many courts, [that evidence] would "invade the province" … of the jury' is… ' "so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric," and "remains simply one of those impracticable and misconceived utterances which lack any justification in principle." ' [Citations.]" (*Ibid.*)

The defendant's version of events starkly contrasted with the testimony of several witnesses. To ask defendant whether such categorically different accounts were "lies"

does not cross the boundary of acceptable cross-examination. "In challenging a witness's testimony, a party implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed. A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable." (*People v. Chatman*, *supra*, 38 Cal.4th at p. 382.)

## II. THE COURT DID NOT ERR IN ADMITTING EVIDENCE OF THE ALLEGED INCIDENTS INVOLVING A.G., J.G., AND L.C.

Defendant contends the court should have excluded evidence of the alleged incidents involving A.G., J.G. and L.C. pursuant to Evidence Code section 352. We disagree.

"A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*Ibid.*)

Defendant's claim of error is based on a deeply flawed premise. He argues that "the uncharged offenses evidence could be misused to support an inference of a generalized criminal predisposition related in some way to young girls." To the contrary, inferring that defendant has a predisposition to commit sex crimes against young girls is an entirely legitimate inference under Evidence Code 1108. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013.) "A jury may use 'the evidence of prior sex crimes to find that defendant had a propensity to commit such crimes, which in turn may show that he committed the charged offenses. [Citations.]" (*Ibid.*)

The probative value of this evidence was not substantially outweighed by the risk of undue prejudice. "Evidence of a prior sexual offense is indisputably relevant in a

14.

prosecution for another sexual offense." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 179.) Here, the prior offense evidence was highly probative on the legitimate issue of whether defendant had a propensity to commit sex crimes against young girls. Each of the prior incidents involved defendant contacting young girls between the ages of 11 to 14 away from other adults. The L.C. and A.G. incidents each involved defendant verbally expressing his desire to engage in sex acts with young girls.

Defendant attempts to undermine the probative value of the prior incident evidence by pointing to certain dissimilarities between the incidents. For example, he notes that he "allegedly approached AG and JG on the street" whereas he "allegedly talked to LC at the front door of her home." At most, defendant's observations may weaken the value of the evidence in showing intent or common plan. (See Evid. Code, § 1101, subd. (b).) But these are not the type of dissimilarities that are relevant under Evidence Code section 1108 because they do not undermine the propensity reasoning that gives these prior incidents the bulk of their probative value.

Defendant also argues that because he was not prosecuted or convicted of the uncharged offenses, their admission caused undue prejudice. It is true that the prejudicial effect of evidence is often heightened when the charged acts did not result in criminal convictions. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*).) In that situation, a jury might be inclined to punish the defendant for uncharged offenses. (*Ibid.*) But here, the jury was instructed that even if it believed defendant had committed the uncharged offenses, that would not be "sufficient by itself to prove that the defendant is guilty of Counts 1 through 11" and that the prosecution "must still prove the charge beyond a reasonable doubt." In order for the danger envisioned by *Ewoldt* to be realized in this case, the jury would have had to completely ignore the court's instruction. Moreover, even if "the danger that the jury might have been inclined to punish defendant for the uncharged offenses" (*ibid.*) was not completely dispelled, neither did it create so great a probability of undue prejudice so as to *substantially* outweigh the probative value

15.

of the evidence. The court was not required to exclude the evidence of uncharged offenses.[12]

## III. THE PROSECUTOR DID NOT COMMIT PREJUDICIAL ERROR DURING ARGUMENT

Defendant alleges that the prosecutor committed several instances of misconduct during argument. We outline those contentions below.

### A. Alleged *Bolton* Error

Defendant alleges that the prosecutor suggested during argument she had additional evidence outside the record that would bolster her case. This, defendant argues, was prejudicial error under *People v. Bolton* (1979) 23 Cal.3d 208 (*Bolton*).

During rebuttal argument, the prosecutor commented:

"[O]ne last thing about [A.G.] I forgot to say regarding the stolen truck and the fact that there was no report. We didn't put in a lot of evidence about each case. We basically put in the evidence from the victim, from [A.G.], from [L.C.], from [J.G.], because the standard for those is a preponderance standard, is it more likely than not, and because it's just in an effort to show you the whole picture about defendant."

Defendant did not raise a *Bolton* objection to these comments. When the defendant fails to object to the prosecutor's argument, claims of prosecutorial misconduct are waived. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 761.)

Defendant seeks to avoid the import of his failure to object by encouraging us to "reach this issue by inquiring into the competence of trial counsel." "[T]here is a 'strong

_____

**12** Even if the trial court had been required to exclude the evidence under Evidence Code section 352, we would not conclude defendant was prejudiced. The jury acquitted defendant on one count, convicted him of lesser included offenses with respect to two counts, found several enhancements not true, and was unable to reach a verdict on three counts. This suggests the jury did not simply base its verdicts on a desire to punish defendant for uncharged crimes. Rather, it suggests the jury carefully weighed the evidence on each charge.

presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437.) " ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*Ibid.*) Here, the record does not " 'affirmatively disclose[]' " (*ibid.*) that counsel had no " ' "rational tactical purpose" ' " (*ibid.*) for not objecting to the prosecutor's argument. Counsel may have concluded that the prosecutor's argument, even if objectionable, was beneficial. After all, the prosecutor's argument was based on the express premise that the prosecution "didn't put in a lot of evidence about each case." Because the record does not affirmatively disclose that counsel had no rational tactical purpose for not objecting to this portion of the prosecutor's argument, we will not reverse the judgment on this basis.

### B. Alleged Appeal to Passions and Prejudices of the Jury

Defendant also claims that the prosecutor improperly appealed to the passions and prejudice of the jury. Defendant identifies several allegedly improper portions of the prosecutor's opening statement and closing argument, which we set forth below:

> "A predator. That's what you're gonna hear about during this trial. You're going to hear about this predator, Luis Calderon, and how he preys on little girls. He finds them alone, he finds them vulnerable, and he pounces on them. He's done it more than once, and he's been doing it for years."

> "At the end of the trial it will be up to you to decide what happened to [C.L.] and [T.G.] And I'm going to come back to you and I'm going to ask you to end this predator's hunt and find him guilty."

> "The defendant, Luis Calderon, is a predator, plain and simple. This man is a predator, and he hunts for his victims –"

> "He hunts for young girls between the ages of ten and fourteen. He finds them alone, he finds them vulnerable, and then he pounces. He touches them, he molests them, he feeds on their innocence."

17.

"And then you heard from [J.G.] and [L.C.] and [A.G.] to show you that these were not isolated incidents and that the defendant is a hunter. He's a predator."

"But you know what is reasonable? You know what is true. You know that [C.L.] told you the truth and this happened. You know that [T.G.] told you the truth and this happened. You know that the truth is that the defendant is a predator. The truth is that the defendant molested [C.L.], molested [T.G.], and that he has done it before. He tried to do it to [J.G.], he tried to do it to [L.C.], and he did it to [A.G.] That is the truth."

"And I am asking you to stop this predator's hunt, to stop the defendant, and find him guilty on all charges and all special allegations."

"The defendant, though, he has a motive to lie. He has the biggest motive to lie in this case. He doesn't want to get in trouble. He doesn't want to get caught for all of this. He is the one who sat up here and he lied. He lied to me, he lied to you, he lied to the whole courtroom, because he's a child molester, he is a predator, and he doesn't want to get caught. [J.G.], [L.C.], [A.G.], [C.L.], and [T.G.], five victims, two in this case. You know what he did. You know the defendant is a child molester. Find him guilty."

Defendant did not object to the prosecutor's argument as an improper appeal to the passions and prejudice of the jury. Consequently, this claim was forfeited. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 761.)

Moreover, the prosecutor's arguments were not improper appeals to the passions and prejudice of the jury. " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1195.) Here, the prosecutor's epithets were warranted by the evidence. Two girls testified to completely separate incidents where defendant – a stranger – drove by and invited them into his vehicle. Several girls testified that defendant had molested them. Thus, a "fair review of the record supports the description of defendant" (*ibid*) as a "predator" and a "child molester." We find no impropriety in the prosecutor's use of those descriptions.

### C. The Prosecutor's Argument did not Shift the Burden of Proof to Defendant to Produce Evidence

During argument, the prosecutor commented:

"First of all, [C.L.] was found right after the assault. She was found by Leonda hiding in a cabinet. What other reason would she have been in that cabinet? I mean, it's just – it doesn't make any sense to think that she was just hiding in that cabinet and then when someone came to find her that she just made up this entire story. She was found immediately after."

Also during closing argument, the prosecutor told the jury:

"And something that also is really important to remember, [C.L.] had nothing to gain by making up this story, by talking to the police, by coming into court and testifying against the defendant and having to explain to you all the sexual details of this assault. She had nothing to gain from it. There is no motive for her to lie. Nothing. There is absolutely no reason for her to make this up and have to go through all of these steps involved in taking this case to trial."

Later, the prosecutor said:

"And, again, there's no reason for [T.G.] to make this up. We've heard absolutely no testimony about what [T.G.] benefits from, what motive she has to lie, to make up this story, tell the police about it, have to come in here and testify on the stand about how when she was ten years old the defendant put his hand on her vagina. Nothing. No evidence of a reason to lie."

The prosecutor also commented:

"Defense counsel brought up the issue of her prior molest, that [C.L.] said she was previously molested by her Uncle Juan. [¶] First of all, I want you to remember that there's no evidence that that's not true. There's no evidence that [C.L.] was lying about her Uncle Juan, that she was not molested by her Uncle Juan. And just because somebody was molested once does not mean that it can't happen again."

19.

Finally, the prosecutor argued:

"The defense wants you to believe that every single witness that came in here lied to you, even though there's no motive for them to lie. No motives have been shown at all for all of these people to walk in here and tell lies. It's ludicrous."

Defendant posits that the prosecutor's arguments improperly shifted the burden of proof onto defendant to produce evidence that (1) prosecution witnesses had a motive to lie, (2) C.L. was lying about being molested by her Uncle Juan, and (3) that C.L.'s story was inconsistent. Not so. At no point during the portions of argument cited by defendant did the prosecutor describe the burden of proof. Rather, she was arguing that the defense had offered no evidentiary support for certain propositions. "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence …." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The prosecutor's argument did not constitute misconduct.

### D. The Prosecutor did not Argue that the Jury Needed to Completely Reject the Prosecution's Case Before Acquitting Defendant

At one point, the prosecutor argued:

"And I want you to ask yourselves what is reasonable doubt, what is unreasonable. And let me tell you what is unreasonable in this case. It is unreasonable to believe everything the defendant said on the stand. It is unreasonable to believe that every single witnesses we had over testimony since last Wednesday came in here and lied to you; unreasonable to believe that [C.L.] and [T.G.], who don't even know each other, both made up this story about the defendant; unreasonable to believe that the defendant is the unluckiest guy in the world in that he has had five different girls – five different girls – accuse him of molest [*sic*] or following them home: [C.L.], [T.G.], [J.G.], [L.C.], [A.G.]."

20.

Defendant posits that this argument required "wholesale rejection of the prosecution case" before the jury could acquit defendant. Not so. The prosecutor was simply discouraging the jury from crediting defendant's testimony over the testimony of the alleged victims. This was an entirely proper line of argument. And it was quite different than telling the jury that they must convict defendant if they believe *any* part of the prosecution's case. Of course, such a comment would likely have been error. Fortunately, the prosecutor made no such comment here.

### E. The Prosecutor did not Tell the Jury it had a Duty to Convict Defendant

The prosecutor closed her rebuttal argument by saying, "You know the defendant is a child molester. Find him guilty." Defendant claims the prosecutor effectively told jurors that it was their duty to convict him.

Technically, the prosecutor's final sentence is grammatically phrased as a command. However, in the context of the prosecutor's comments and the court's instructions, no reasonable juror would interpret the prosecutor's comment to mean that they have no choice but to convict defendant. Rather, the jurors would have understood that the prosecutor was merely urging them to convict. Moreover, the court told the jury that it was up to them alone to decide what happened, and that the court's instructions prevail over the attorneys' comments. The court's instructions before closing argument made clear that if the prosecution did not meet its burden the jury "must" find the defendant not guilty.

In sum, we think it is clear that the prosecutor was *urging* the jury return a guilty verdict rather than informing the jury that they have no choice but to convict. We find no misconduct.

### F. The Prosecutor did not Erroneously Tell the Jury to View the Case from the Victim's Eyes

At one point, the prosecutor argued as follows:

"… if I asked, is there any person here who would raise their hand and volunteer if I asked you to get upon this witness stand and tell us about your most recent sexual experience that you had and all the details .… [¶] No. And I imagine it's because nobody would want to do that. It's embarrassing, even to come up and sit here and tell everybody in this room about a consensual, loving, great experience that you had. Even if it was all a positive experience, I still doubt that anybody wants to sit up in this chair and say, 'First we did this and then we did this and then this happened.' No, because just even that's embarrassing. It's difficult to talk about. It's something private that we don't talk about. [¶] So when we're talking about what [C.L.] said, what order she said things happened in, think about that. Think about her having to recount this to a nurse, to a police officer, to you up there on the stand, that she may not have been sitting there and taking notes during her experience or taking notes when she was talking to the detectives."

Defendant contends that the prosecutor's argument improperly told jurors "to view the situation through the eyes of" C.L. This characterization is incorrect. The prosecutor told jurors to view the situation through their own eyes. Specifically, the prosecutor asked the jurors to imagine testifying about a consensual experience *they* had. Then, the prosecutor compared that hypothetical to what C.L. experienced testifying. The prosecutor did not ask the jurors to imagine if they had experienced what C.L. had. Rather, she suggested one way the jury could evaluate the testimony. We find no error.

## IV. THE SENTENCE ON COUNT 9 MUST BE STAYED

Defendant contends that counts 3 and 9 were based on the same act of defendant having C.L. touch his penis. As a result, he may not be punished for both pursuant to section 654. Respondent's concedes the issue, and we agree.

Section 654 prohibits the punishment of "[a]n act … under more than one provision." (§ 654, subd. (a).) Here, counts 3 and 9 were based on the fact that defendant had C.L. touch his penis. As a result, imposition of the sentence on count 9 must be stayed. (See § 654, subd. (a).)

## V.   DEFENDANT FORFEITED HIS CHALLENGE TO THE SEXUAL ASSAULT MEDICAL EXAMINATION FEE

Finally, defendant claims the court imposition of a sexual assault examination fee (§ 1203.1h, subd., (b)) was improper because the court did not make findings on the actual cost of the examination and defendant's ability to pay.  Respondent contends that defendant forfeited this claim by failing to object below.[13]  We agree.

In *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*), the Supreme Court held that a defendant forfeited his challenge to a booking fee (Gov. Code, § 29550.2, sub. (a)) when he failed to object below.

> " ' " '[A] constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " '
> [Citation.]  'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.'  [Citation.]  ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.  [Citation.]" '  [Citation.]  Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'  [Citation.]"  (*McCullough*, *supra*, 56 Cal.4th at p. 593.)

As with the booking fee (Gov. Code, § 29550.2, subd. (a)) analyzed in *McCullough*, defendant's ability to pay the sexual assault examination fee (§ 1203.1h, subd. (b)) is a factual issue.  As *McCullough* held in an analogous context, we conclude

---

[13] Defendant suggests that his counsel "[a]rguably" objected to the imposition of the fee.  Near the end of the sentence pronouncement the court said, "I need to impose some fees."  Defense counsel said, "I'd ask for the minimum, your Honor."  The court went on to impose fines pursuant to sections 1202.4 and 1202.45 before imposing the sexual assault examination fee.  Defendant now contends that defense counsel's request for "the minimum" in fees "sufficed to place the substance of [the sexual assault exam fee] objection before the sentencing court."  We disagree.  Defense counsel's comment was not even directed to the sexual assault examination fee in particular, which had not even been imposed yet.  The comments were not sufficient to assert the objection defendant now raises on appeal.

that by " 'failing to object on the basis of his [ability] to pay,' defendant forfeits both his claim of factual error and the dependent claim challenging 'the adequacy of the record on that point.' [Citations.]" (*McCullough*, *supra*, 56 Cal.4th at p. 597.)  Similarly, the actual cost of the sexual assault examination was a factual issue that needed to be raised below.

## DISPOSITION

The judgment is modified to reflect that the imposition of the sentence on count 9 is stayed pursuant to section 654.  The trial court is directed to prepare and serve as appropriate an amended abstract of judgment.  As modified, the judgment is affirmed.


_____
Poochigian, J.


WE CONCUR:


_____
Kane, Acting P.J.


_____
Franson, J.